1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10
                          ----oo0oo----
11
MELVIN ROSALES and CHARLIE
12 HARRIS,                          NO. CIV. 08-1383 WBS KJM

13         Plaintiffs,
                                    MEMORANDUM AND ORDER RE:
14    v.                            MOTION FOR SUMMARY JUDGMENT

15 CAREER SYSTEMS DEVELOPMENT
   CORPORATION, a Delaware
16 corporation; and DOES 1
   through 10, inclusive,
17
           Defendants.
18 _____/

19                        ----oo0oo----

20         Plaintiff Melvin Rosales brought this action alleging

21 that his employer, defendant Career Systems Development

22 Corporation ("CSDC"), unlawfully terminated his employment

23 because of his age, race, national origin, and for engaging in

24 certain protected activities.  Defendant now moves for summary

25 judgment pursuant to Federal Rule of Civil Procedure 56.[1]

26 _____

27         [1]  On December 31, 2008, the court approved a stipulation
   among the parties to submit the claims brought by plaintiff
28 Charlie Harris to binding arbitration and to dismiss him as a

                                 1

1   I.    <u>Factual and Procedural Background</u>

2          Defendant CSDC is a private company that contracted

3   with the U.S. Department of Labor to operate the Sacramento Job

4   Corps Center ("Center").  (Stinson Decl. ¶ 3.)  The Center

5   provides free education and vocational training for disadvantaged

6   young people between the ages of sixteen and twenty-four.  (<u>Id.</u>)

7          In January 2002, the Center hired plaintiff as a

8   Vocational Counselor.  (Rosales Decl. ¶ 2.)  Plaintiff is a

9   Filipino man who was born in the Phillippines and, at the time he

10  was hired by the Center, was fifty-nine years old.  (<u>Id.</u>)  As

11  part of the hiring process, plaintiff was initially interviewed

12  by Alan Roberts, who was a Group Life Supervisor at the time,

13  followed by Edward Bianis,[2] who was a Counseling Supervisor.

14  (<u>Id.</u> ¶ 4.)

15         A few months after the Center hired plaintiff, Roberts

16  demoted Bianis, purportedly due to certain complaints made by

17  Vocational Counselors.  (<u>Id.</u> ¶ 5-6; Bianis Decl. ¶ 8.)  Plaintiff

18  and other Vocational Counselors, however, denied that they had

19  made any complaints, and they wrote a letter to Roberts

20  requesting a meeting to discuss Bianis's demotion.  (Rosales

21  Decl. ¶ 6; Bianis Decl. ¶ 8.)  According to plaintiff, Roberts

22  became very confrontational at this meeting and, thereafter,

23  _____

24  plaintiff.  (<u>See</u> Docket No. 13.)  Accordingly, Rosales is the
    only plaintiff remaining in this case.
25

26         [2]   There appears to be some confusion as to the proper
    spelling of this person's last name.  Plaintiff refers to this
27  person as "Beanes," while defendant refers to him as "Bianis."
    Because the signature on this person's declaration appears to
28  contain the letter "i," the court will adopt defendant's
    spelling.

plaintiff's relationship with Roberts was unfriendly.  (Rosales Decl. ¶ 6; Bianis Decl. ¶ 8.)

In December 2003, plaintiff applied for a promotion to the position of Director of Social Development.  (Id. ¶ 8.)  That position required a bachelor's degree in "counseling or [a] work-related field," and applicants with a master's degree in "counseling, social services[,] or psychology" were preferred.  (Id. Ex. B at 1.)  Plaintiff had both a bachelor's degree and a master's degree in the specified fields, but the position was ultimately given to one Jack Jolliff, a Caucasian who had neither a bachelor's degree in the specified fields nor a master's degree.  (Id. ¶ 9.)  Plaintiff contacted Eugene Harris, one of the persons who interviewed applicants for the position, and stated that he believed he had been discriminated against on the basis of his race and age, but no action was taken.  (Id. ¶¶ 10-11.)

In September 2004, plaintiff applied for a promotion to the position of Director of Employability.  (Id. ¶¶ 12-13.)  That position required a bachelor's degree in a "work-related field," and applicants with "[t]hree years [of] work-related experience, one of which was in a supervisory capacity," were preferred.  (Id. Ex. D at 1.)  Although plaintiff had these qualifications, the position was ultimately given to one Deana Gelman, a person who had less experience than plaintiff and for whom the application deadline was extended.  (Id. ¶¶ 13-15.)  Plaintiff contacted Peter Gregerson, the Center Director at the time, and indicated that he believed he had been discriminated against on the basis of his race and age, but no action was taken.  (Id. ¶

16.)

       In the fall of 2005, Roberts and Traci Allen, the
Center's Career Development Director, interviewed plaintiff for
the position of ACT/OCT Coordinator.  (Id. ¶¶ 18-19; Roberts
Decl. ¶ 4; see Durrant Decl. Ex. 12.)  Roberts and Allen
ultimately decided to promote plaintiff to that position.
(Rosales Decl. ¶ 18; Roberts Decl. ¶ 4.)  On December 6, 2006,
Allen completed a "Performance Growth & Development Assessment"
evaluating plaintiff's performance as ACT/OCT Coordinator, in
which she described plaintiff as meeting or exceeding all work-
related expectations.  (See Rosales Decl. Ex. F.)

       On December 9, 2006, plaintiff and his wife attended
the wedding of Juan Silva, whom plaintiff was currently mentoring
as a trainee at the Center.  (Id. ¶ 19.)  Plaintiff and his wife
brought a gift, a small pot worth approximately twenty dollars.
(Durrant Decl. Ex. 2 ("Rosales Dep.") at 115:2-4.)[3]  At the
wedding, plaintiff sat with another trainee, but plaintiff soon
left after approximately thirty minutes when certain trainees
started drinking alcohol.  (Id. at 115:16-19.)  Plaintiff
believed that remaining at the wedding and drinking alcohol with
the trainees would be inappropriate fraternization, which is
prohibited by Center policy.  (Id. at 115:21-116:2.)

       The Center's policy against fraternization is provided

_____

       [3]   Plaintiff objects to the consideration of his
deposition on the ground that defendant has not included the
reporter's certification.  (See Pl.'s Evid. Obj. 1:26-27.)
However, the complete deposition lodged with the court pursuant
to Local Rule 5-133(j) is certified; accordingly, plaintiff's
objection is overruled.  See, e.g., Bell v. Mejia, No. 06-886,
2008 WL 2917599, at *2 n.1 (E.D. Cal. July 25, 2008).

in a form titled, "Sexual Harassment [and] Staff/Student Fraternization." (Durrant Decl. Ex. 4 ("Policy") at 1.) When plaintiff was first hired by the Center in January of 2002, he received and signed a copy of this form, which stated:

> <u>Staff/Student Fraternization</u> is defined as follows:
>
> Socializing with students on or off Center, except when in the performance of one's job.
>
> Visiting with students.
>
> Providing rides to students in private vehicles.
>
> Borrowing/lending money or other items to students.
>
> Inviting students to a staff member's home, or providing housing to students.
>
> Selling to or buying from students.
>
> Getting involved with a student, in any manner other than while carrying out the duties and responsibilities of one's job.

(<u>Id.</u>) Above plaintiff's signature, that form also provided, "I acknowledge by my signature that I have read and understand [the Center's] rules and regulations relating to **Sexual Harassment and Staff/Student Fraternization.** I understand that by not adhering to the above rules, I will be subject to immediate discipline up to and including dismissal from my job." (<u>Id.</u>)

On December 11, 2006, plaintiff informed his supervisor, Allen, that he had attended Silva's wedding and had given Silva a gift. (Rosales Decl. ¶ 22; Allen Decl. ¶ 4.) Allen subsequently met with Roberts and Human Resources Manager Rebecca McClure to discuss plaintiff's admission. (Allen Decl. ¶ 4.) Allen, Roberts, and McClure determined that plaintiff's actions had violated the Center's fraternization policy and concluded that it was appropriate to terminate plaintiff's

1   employment.  (Id.; Roberts Decl. ¶ 6.)

2           Roberts then contacted Jeff Stinson, Senior Vice

3   President of Human Resources and Administration for CSDC, who

4   agreed that plaintiff's conduct had violated the fraternization

5   policy and that it was appropriate to terminate plaintiff's

6   employment on that basis.  (Roberts Decl. ¶ 6; Stinson Decl. ¶

7   8.)  Allen and McClure informed plaintiff of his termination on

8   December 12, 2006.  (Rosales Decl. ¶ 23; Rosales Dep. 121:8-13.)

9           On December 19, 2006, plaintiff submitted a wrongful

10  termination grievance to McClure, asserting that his termination

11  was "capricious and arbitrary" and was "triggered by a systematic

12  pattern of discrimination against [his] person on the basis of

13  age and ethnicity."  (Id. Ex. G.)  After meeting with Allen and

14  McClure on January 5, 2007, plaintiff received a letter from

15  McClure dated January 8, 2007, which stated, "The decision made

16  to terminate your employment based on you violating company

17  policy of fraternization stands. . . . If you do not agree, you

18  may request in writing a meeting with the Center Director within

19  three (3) working days."  (Id. Ex. H.)  On January 11, 2007,

20  plaintiff again submitted a wrongful termination grievance to

21  McClure, stating that his termination "encapsulates a history of

22  prejudices and discriminations" and requesting a meeting with

23  Roberts.  (Id. Ex. I.)

24          Plaintiff met with Roberts on January 25, 2007, to

25  discuss his grievance, at which time plaintiff requested an

26  official definition of "fraternization" as it applied to his

27  termination.  (See id. Ex. K.)  Afterward, plaintiff received a

28  letter from Roberts dated February 1, 2007, which provided,

> You were in fact aware of the company policy of
> fraternization with trainees and that you violated said
> policy by attending a [w]edding reception and also
> purchased a gift for the trainee.  You admitted during
> your meeting with me that you attended the reception and
> gave the trainee a gift.

(Id. Ex. J.)  Plaintiff also received a letter from McClure in

response to his request for a definition of fraternization, which

provided a page from CSDC's Employee Handbook that defined

"fraternization" as "non-professional, immoral[,] or unethical

situations including other than "Arm[']s Length" relationships,

allowing any student/client in a staff member's place of

residence without appropriate prior approval, exploiting

students/clients for personal profit or gain, etc."  (Id. Ex. L;

Durrant Decl. Ex. 3 ("CSDC Handbook") at 27.)

After exhausting CSDC's internal grievance system,

plaintiff filed a formal complaint of age and race

discrimination with the California Department of Fair Employment

and Housing ("CDFEH") on April 19, 2007.  (Durrant Decl. Ex. 20.)

Plaintiff subsequently received a right-to-sue letter from the

U.S. Equal Employment Opportunity Commission ("EEOC") on March

20, 2008.  (Id. Ex. 21.)  Thereafter, plaintiff filed his

Complaint in this court on June 18, 2008, alleging racial

discrimination, national-origin discrimination, and retaliation

in violation of Title VII, 42 U.S.C. §§ 2000e-2, 2000e-3, and the

Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §

12940(a), (h); age discrimination and retaliation in violation of

the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §

623(a), (d), and FEHA, Cal. Gov't Code. § 12940(a), (h); as well

as a claim for wrongful discharge in violation of public policy.

7

1  Defendant now moves for summary judgment pursuant to Rule 56 of
2  the Federal Rules of Civil Procedure.

3  II.  <u>Discussion</u>

4          Summary judgment is proper "if the pleadings, the
5  discovery and disclosure materials on file, and any affidavits
6  show that there is no genuine issue as to any material fact and
7  that the movant is entitled to judgment as a matter of law."
8  Fed. R. Civ. P. 56(c).  A material fact is one that could affect
9  the outcome of the suit, and a genuine issue is one that could
10 permit a reasonable jury to enter a verdict in the nonmoving
11 party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
12 248 (1986).  The moving party bears the burden of demonstrating
13 the absence of a genuine issue of material fact.  <u>Id.</u> at 256.  On
14 issues for which the ultimate burden of persuasion at trial lies
15 with the nonmoving party, the moving party bears the initial
16 burden of establishing the absence of a genuine issue of material
17 fact and can satisfy this burden by presenting evidence that
18 negates an essential element of the nonmoving party's case or by
19 demonstrating that the nonmoving party cannot produce evidence to
20 support an essential element of its claim or defense.  <u>Nissan</u>
21 <u>Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.</u>, 210 F.3d 1099,
22 1102 (9th Cir. 2000).

23         Once the moving party carries its initial burden, the
24 nonmoving party "may not rely merely on allegations or denials in
25 its own pleading," but must go beyond the pleadings and, "by
26 affidavits or as otherwise provided in [Rule 56,] set out
27 specific facts showing a genuine issue for trial."  Fed. R. Civ.
28 P. 56(e); <u>accord</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324

1  (1986); <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135, 1137 (9th Cir.

2  1989).  On those issues for which it will bear the ultimate

3  burden of persuasion at trial, the nonmoving party "must produce

4  evidence to support its claim or defense." <u>Nissan Fire</u>, 210 F.3d

5  at 1103.

6         In its inquiry, the court must view any inferences

7  drawn from the underlying facts in the light most favorable to

8  the nonmoving party.  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith</u>

9  <u>Radio Corp.</u>, 475 U.S. 574, 587 (1986).  The court also may not

10 engage in credibility determinations or weigh the evidence, for

11 these are jury functions.  <u>Anderson</u>, 477 U.S. at 255.

12     A.   <u>Evidentiary Objections</u>

13         "A trial court can only consider admissible evidence in

14 ruling on a motion for summary judgment." <u>Orr v. Bank of Am., NT</u>

15 <u>& SA</u>, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P.

16 56(e); <u>Beyene v. Coleman Sec. Servs., Inc.</u>, 854 F.2d 1179, 1181

17 (9th Cir. 1988)).  In its reply to plaintiff's opposition to

18 summary judgment, defendant lodged several objections challenging

19 the competency of plaintiff's evidence.  After noting that many

20 of these objections appeared meritorious, the court granted

21 plaintiff an additional week to procure competent evidence in

22 opposition to defendant's motion for summary judgment.  (<u>See</u>

23 Docket No. 31.)  Despite plaintiff's counsel's assurances that

24 such evidence would be forthcoming, plaintiff ultimately filed an

25 additional opposition brief in which he submitted that the court

26 need not "rely[] on any additional independent evidence of

27 discrimination" and "contends that his evidence is sufficient to

28 raise a genuine issue of material fact." (Pl.'s 2d Opp'n Summ.

J. 1:25-2:2.)  At the September 15, 2009, hearing on defendant's motion for summary judgment, the court afforded plaintiff another two-week opportunity to amend his declarations and procure competent evidence.  (See Docket No. 39.)  In his third attempt to provide competent evidence, plaintiff submitted supplemental declarations for Joany Titherington and Edward Bianis, and a new declaration from one Oesha Goss.  (See Docket Nos. 41-43.)  In response, defendant has raised further objections challenging the competency of these new declarations.

### 1.  Personal-Knowledge

"Rule 56(e) of the Federal Rules of Civil Procedure requires that declarations used to support or oppose summary judgment motions 'shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the [declarant] is competent to testify to the matters stated therein.'"  S.E.C. v. Phan, 500 F.3d 895, 913 (9th Cir. 2007) (quoting Fed. R. Civ. P. 56(e)).  In opposition to summary judgment, plaintiff has submitted his own declaration, which counsel declined to amend despite having two opportunities to do so.  There are legitimate questions as to whether many of the facts provided therein have the requisite foundation to be admissible.  Specifically, paragraphs nine, fifteen, and twenty-four provide:

> I learned that Mr. Jolliff had withdrawn his application for the promotion because of his commitment to the National Guard and had been encouraged to re-apply for the position.  Additionally, Mr. Jolliff did not have the requisite degree nor did he have a Master's degree in counseling which the promotion announcement indicated was preferred.

(Rosales Decl. ¶ 9.)

10

1  [T]he Center Director extended the application cutoff
2  date and allowed the Human Resources [M]anager, Deana
   Gelman, who had no experience in employability areas, to
3  apply for the position.

4  (Id. ¶ 15.)

5  "I was replaced as [ACT/OCT] Coordinator by a woman in her
   mid-[thirties]."

6  (Id. ¶ 24.)

7      Plaintiff has not affirmatively demonstrated how he

8  "learned" the foregoing information.  It is unclear, for example,

9  how plaintiff came to know of the age of the person who replaced

10 him after he was no longer employed at the Center; if plaintiff

11 had somehow acquired personal knowledge of this fact, plaintiff

12 should have set forth in his declaration the circumstances under

13 which he had done so.  During discovery, plaintiff also had ample

14 opportunity to depose Jolliff or Gelman regarding their

15 qualifications or to obtain their declarations.[4]  See generally

16 Fed. R. Civ. P. 56(c), (d)(1), (e)(1)-(2).  Plaintiff also could

17 have directed requests for admissions or interrogatories to

18 defendant regarding this information.  See id. 31-32, 33, 36.  In

19

20      [4]   In opposition to defendant's motion for summary
   judgment, plaintiff refers to a deposition taken of Gelman in a
21 separate lawsuit pending in this court captioned Her v. Career
   Systems Development Corporation.  Without expressing any opinion
22 as to the propriety of this evidence, the court notes that it
   does not support plaintiff's statements regarding Gelman's
23 professional experience.  That deposition provides as follows:

24    Q:  Was there a position description that included
           qualifications?

25    A:  Yes.

26    Q:  Did you believe you met the qualifications?

27    A:  I really don't remember at the time.

28 (Gill Decl. (Docket No. 25) Ex. A at 3.)

11

1   its current form, plaintiff's declaration leaves the court to

2   speculate as to the source of much of the information it

3   contains.

4          2.   Hearsay

5          Defendant argues that hearsay issues are implicit in

6   many portions of plaintiff's declarations.  A court may sometimes

7   consider hearsay evidence at the summary judgment stage where

8   that evidence satisfies the requirements of Federal Rule of Civil

9   Procedure 56(e).  See Block v. City of Los Angeles, 253 F.3d 410,

10  418-19 (9th Cir. 2001) ("To survive summary judgment, a party

11  does not necessarily have to produce evidence in a form that

12  would be admissible at trial, as long as the party satisfies the

13  requirements of [Rule 56(e)].").  For example, in Fraser v.

14  Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003), the Ninth Circuit

15  concluded that, for purposes of summary judgment, "[i]t would be

16  sufficient if the contents of [a] diary [were] admissible at

17  trial, even if the diary itself may be inadmissible."  The court

18  reasoned that "[t]he contents of the diary [were] mere

19  recitations of events within Fraser's personal knowledge and,

20  depending on the circumstances, could be admitted into evidence

21  at trial in a variety of ways."  Id.  Regardless of the

22  admissibility of the challenged statements, plaintiff has

23  produced sufficient non-hearsay evidence that this court may

24  evaluate in deciding this motion.

25         3.   Relevance

26         Defendant has lodged numerous objections to evidence

27  submitted by plaintiff on the ground that this evidence is

28  irrelevant.  While the court may agree with defendant as to many

12

of these objections,[5] a painstaking discussion of each objection
is unnecessary.   As this court and others have often explained,
summary judgment can be granted "only when there is no genuine
dispute of <u>material</u> fact.   It cannot rely on irrelevant facts,
and thus relevance objections are redundant." <u>Burch v. Regents</u>
<u>of Univ. of Cal.</u>, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006);
<u>see</u> <u>Smith v. County of Humboldt</u>, 240 F. Supp. 2d 1109, 1115-16
(N.D. Cal. 2003) (declining to rule on the evidentiary objections
in defendant's reply because "even if the evidence submitted by
plaintiff is considered by this Court, plaintiff fails to state a
colorable claim").

### 4.   Other Improper Evidence

In opposition to defendant's motion for summary
judgment, plaintiff has submitted three complaints from different
lawsuits pending in Sacramento County Superior Court.   (<u>See</u>
Docket No. 29.)   Referencing these complaints, plaintiff asserts,
"This is not Alan Roberts' first encounter with discrimination
lawsuits. . . . [T]here is little doubt that Roberts has been
alleged to act on discriminatory tendencies through his tenure at
[CSDC]." (Pl.'s Opp'n Summ. J. 6:22-23, 7:8-9.)   The facts
alleged in these complaints do not constitute competent evidence
for purposes of summary judgment; indeed, the facts alleged in
plaintiff's own Complaint are not evidence, <u>see</u> Fed. R. Civ. P.
56(e)(2), and neither are the facts alleged by parties in

---

[5]     Indeed, much of plaintiff's evidence does not give rise
to any inference of discrimination and is entirely consistent
with typical office politics and "the ordinary tribulations of
the workplace." <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548
U.S. 53, 68 (2006).

1  separate lawsuits.  See, e.g., Thomas v. Chrysler Fin., LLC, 278

2  F. Supp. 2d 922, 926 (N.D. Ill. 2003) ("Thomas cites only

3  allegations in a complaint in another lawsuit against Chrysler--

4  clearly not evidence that may be considered under Rule 56(e).").

5  Accordingly, the court will not evaluate this evidence for the

6  purposes of defendant's motion for summary judgment.

7      B.  ADEA Exhaustion

8          Both Title VII and the ADEA require exhaustion of

9  administrative remedies before filing a lawsuit alleging

10 employment discrimination.  See 42 U.S.C. § 2000e-5(e)(1); 29

11 U.S.C. § 626(d).  Here, defendant does not dispute that plaintiff

12 timely filed a formal complaint of race and age discrimination

13 with the CDFEH and that, pursuant to a "worksharing" agreement

14 with the EEOC, that complaint was a timely filing with the EEOC

15 for purposes of Title VII and the ADEA.  See Surrell v. Cal.

16 Water Serv. Co., 518 F.3d 1097, 1104 (9th Cir. 2008) (citing

17 Green v. L.A. County Superintendent of Schs., 883 F.2d 1472, 1476

18 (9th Cir. 1989)).  Defendant contends, however, that plaintiff's

19 claim of age discrimination under the ADEA fails as a matter of

20 law because "[p]laintiff obtained . . . his right-to-sue [letter]

21 for violation of Title VII, but not a right-to-sue [letter] under

22 the ADEA."  (Def.'s Mem. Supp. Mot. Summ. J. 14:5-8.)

23         Contrary to defendant's argument, other circuits and

24 district courts within the Ninth Circuit have consistently

25 recognized that, "unlike claims under Title VII, the ADEA does

26 not require a claimant to first obtain a right to sue letter

27 before initiating a lawsuit."  Keiser v. Lake County Superior

28 Court, No. 05-2310, 2005 WL 3370006, at *10 (N.D. Cal. Dec. 12,

2005) (citing 29 U.S.C. § 626(d)); accord Shek v. Stanford Univ.
Med. Ctr., No. 07-871, 2007 WL 2318904, at *3 (N.D. Cal. Aug. 13,
2007); see, e.g., Francis v. Elmsford Sch. Dist., 442 F.3d 123,
127 (2d Cir. 2006) ("[T]here is no provision in the ADEA that
requires a claimant to receive such a [right-to-sue] letter
before commencing a court action under the ADEA."). Thus, by
timely filing his age discrimination complaint with the CDFEH,
plaintiff has satisfied the exhaustion requirements of the ADEA.[6]

C.   Race, National-Origin, and Age Discrimination

On a defendant's motion for summary judgment, claims of
race, national-origin, and age discrimination under Title VII and
the ADEA are evaluated pursuant to the burden-shifting framework
provided in McDonnell Douglas Corp. v. Green, 411 U.S. 792
(1973). See Whitman v. Mineta, 541 F.3d 929, 932 (9th Cir.
2008). Claims of race, national-origin, and age discrimination
under FEHA are subject to that same analysis. Bradley v.
Harcourt, Brace & Co., 104 F.3d 267, 270 (9th Cir. 1996); see Guz
v. Bechtel Nat'l Inc., 24 Cal. 4th 317, 354 (2000) ("Because of
the similarity between state and federal employment

---

[6]    The court observes that while plaintiff's lawsuit
alleges discrimination based on national origin, his formal
complaint filed with the CDFEH only mentioned discrimination
based on race (Filipino) and age (sixty-four). (See Durrant
Decl. Ex. 20.) Nonetheless, it is well-established that "when an
employee seeks judicial relief for claims not listed in the
original EEOC charge, the complaint 'nevertheless may encompass
any discrimination like or reasonably related to the allegations
of the EEOC charge.'" Freeman v. Oakland Unified Sch. Dist., 291
F.3d 632, 636 (9th Cir. 2002) (quoting Oubichon v. No. Am.
Rockwell Corp., 482 F.2d 569, 571 (9th Cir. 1973)). Here,
because plaintiff's allegations concerning national-origin
discrimination could be "reasonably expected to grow out of" the
allegations contained in his complaint filed with the CDFEH, the
court concludes that plaintiff sufficiently exhausted all aspects
of his Title VII claim.

discrimination laws, California courts look to pertinent federal precedent when applying our own statutes.").

Under the McDonnell Douglas framework, "the burden of production first falls on the plaintiff to make out a prima facie case of discrimination." Coghlan v. Am. Seafoods Co. LLC, 413 F.3d 1090, 1094 (9th Cir. 2005). He may do so by showing that "(1) he belongs to a protected class, (2) he was qualified for the position he held . . . , (3) he was terminated or demoted from . . . that position, and (4) the job went to someone outside the protected class." Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1122 (9th Cir. 2004)). If plaintiff successfully establishes his prima facie case, the "burden of production, but not persuasion, [] shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." Chuang v. Univ. of Cal. Davis, 225 F.3d 1115, 1123-24 (9th Cir. 2000) (citing McDonnell Douglas, 411 U.S. at 802).

Assuming the employer articulates a legitimate, nondiscriminatory reason for its actions, plaintiff, in order to survive summary judgment, bears the burden of supplying evidence to the court that gives rise to an inference of intentional discrimination. See Coghlan, 413 F.3d at 1094 (citing St. Mary's Honot Ctr. at 507-08.).

1.   Prima Facie Case

The parties do not dispute that plaintiff has established the first three elements of a prima facie case for his race, national-origin, and age discrimination claims. First, because plaintiff is Filipino, was born in the Philippines, and

16

was at least forty years of age at the time of his termination,
he was a protected-class member under Title VII, the ADEA, and
FEHA.  See 42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 631(a); Cal.
Gov't Code § 12940(a).  Second, as evinced by plaintiff's
"Performance Growth & Development Assessment" dated December 6,
2006, he satisfactorily performed his job as ACT/OCT Coordinator.
(See Rosales Decl. Ex. F; see also Durrant Decl. Ex. 13 (awarding
plaintiff a "Certificate of Appreciation" on August 29, 2006, for
"outstanding performance").)  Third, plaintiff suffered an
adverse employment action on December 12, 2006, when his
employment at the Center was terminated.[7]  (Id. ¶ 23.)  See
generally Fonseca v. Sysco Food Servs. of Ariz., Inc., 374 F.3d
840, 847 (9th Cir. 2004); Aragon v. Republic Silver State
Disposal Inc., 292 F.3d 654, 660 (9th Cir. 2002).

        To satisfy the fourth prong of his prima facie case for
his Title VII, ADEA, and FEHA claims, plaintiff proffers that he
was replaced in his position as ACT/OCT Coordinator by "an
African-American female in her mid-[thirties]."  (Pl.'s Mem.
Opp'n Summ. J. 10:18-21 (citing Rosales Decl. ¶ 24).)  Ninth
Circuit precedent, however, is somewhat unclear as to whether a
plaintiff's replacement by a person outside of his or her
protected class--standing alone--is sufficient to satisfy this
prong of his or her prima facie case.  Compare Coghlan, 413 F.3d

---

[7]     The parties agree that defendant's failure to promote
plaintiff in December 2003 and September 2004 cannot be
considered adverse employment actions for purposes of plaintiff's
prima facie case because he did not exhaust his administrative
remedies as to these actions.  (See Def.'s Mem. Supp. Summ. J.
6:21-23; Pl.'s Mem. Opp'n Summ. J. 7:12-16); see also 42 U.S.C. §
2000e-5(f)(1); Cal. Gov't Code § 12960(b).

1  at 1094 (finding that an American commercial fisherman

2  established a prima facie case in his Title VII claim for

3  national-origin discrimination where he was passed over for

4  several promotions and "the people chosen instead were

5  Norwegian-born and thus outside the protected class"), with Lyons

6  v. England, 307 F.3d 1092, 1116 (9th Cir. 2002) ("[P]roof that

7  the employer filled the sought position with a person not of the

8  plaintiff's protected class is 'neither a sufficient nor a

9  necessary condition' of proving a Title VII case." (quoting Mills

10  v. Health Care Serv. Corp., 171 F.3d 450, 454 n.1 (7th Cir.

11  1999)) (emphasis added)).

12      Regardless of whether plaintiff has proffered any

13  competent evidence as to the person who replaced him as ACT/OCT

14  Coordinator, he may still establish a prima facie case for his

15  Title VII, ADEA, and FEHA claims if he can adduce other evidence

16  showing that he was "discharged under circumstances otherwise

17  'giving rise to an inference of . . . discrimination,'" Diaz v.

18  Eagle Produce Ltd. P'ship, 521 F.3d 1201, 1207 (9th Cir. 2008)

19  (quoting Coleman v. Quaker Oats Co., 232 F.3d 1271, 1281 (9th

20  Cir.2000)), i.e., that his employer "treated [him] differently

21  than . . . similarly situated employee[s] who [did] not belong to

22  the same protected class," Cornwell, 439 F.3d at 1028 (citing

23  McDonnell Douglas, 411 U.S. at 802).

24      Here, plaintiff asserts in his declaration that he was

25  passed over for promotions to positions for which he was well-

26  qualified and to which other, less-qualified applicants were

27

28

18

1  appointed.[8]  (See Rosales Decl. ¶¶ 8-16.)  Plaintiff does not

2  specify the nationality or age of these employees, but mentions

3  that one of them was "Caucasian."  (See id.)  Defendant has not

4  shown facts to show that the employees promoted over plaintiff

5  were qualified.  Though this evidence alone may not provide

6  "circumstances giving rise to an inference of [age or national-

7  origin] discrimination," it lends greater credence to plaintiff's

8  contention that defendant fired him under circumstances giving

9  rise to an inference of discrimination.  Aragon, 292 F.3d at 660

10 (quoting Coleman, 232 F.3d at 1281) (internal quotation marks

11 omitted).

12        Plaintiff also attempts to establish the fourth prong

13 of his prima facie case by impugning the Center's inconsistent

14 enforcement its fraternization policy.  Defendant contends that

15 it terminated plaintiff's employment consistent with the neutral

16 enforcement of its fraternization policy (Def.'s Mem. Supp. Mot.

17 Summ. J. 10:7-16), while plaintiff insists that this policy was

18 never vigorously enforced and was applied against him because of

19 his race, age, and national origin (Pl.'s Opp'n Summ. J. 9:18-

20 18:4).

21        To discredit defendant's proffered reason for his

22 termination, plaintiff provides the declarations of Edward

23 Bianis, Joany Titherington, Oesha Goss, and Edward Johnson.  As

24

25        [8]  As mentioned previously, because plaintiff did not
   submit these failure-to-promote claims to the CDFEH or the EEOC
26 in an administrative complaint, they cannot constitute actionable
   adverse employment actions in this lawsuit; nonetheless, these
27 events may be properly considered as "background evidence" to
   determine whether plaintiff was terminated under circumstances
28 giving rise to an inference of discrimination.  See Lyons, 307
   F.3d at 1111-12.

1  mentioned previously, Bianis was a Counseling Supervisor at the

2  Center and had interviewed plaintiff in 2002 for the position of

3  Vocational Counselor.  (<u>See</u> Rosales Decl. ¶ 4.)  Titherington was

4  employed by defendant from April 2000 to May 2007 as a

5  Residential Advisor and a Career Counselor, Goss worked for

6  defendant as Student Records Supervisor for approximately nine

7  years until its contract with the Department of Labor ended,  and

8  Johnson was employed by defendant for thirteen years as a

9  Residential Shift Supervisor and acting Group Life Director.

10  (Titherington Decl. ¶ 2; Goss Decl. ¶ 2; Johnson Decl. ¶ 4.)[9]

11       In his declaration, Bianis states, "In my experience

12  the fraternization policy was very loosely applied at the Center.

13  Counselors and resident advisors would frequently give trainees

14  money for bus passes or give them rides to town or similar types

15  of things."  (Bianis Decl. ¶ 9.) Bianis proceeds to describe an

16  instance in 2003 when one of his trainees, a young woman, became

17  romantically involved with a security guard employed by

18  defendant.  (<u>Id.</u> ¶ 10.)  When the relationship was discovered,

19  the trainee was terminated from the program, but defendant

20  continued to employ the security guard.  (<u>Id.</u>)  Bianis also

21  recalls an employee named Bridgette Brown who had transported

22  trainees from the Center to perform work on her own property.

23  (<u>Id.</u> ¶ 11.)  Although Brown was suspended for this conduct, she

24

25       [9]    In its reply, defendant has lodged several evidentiary
26  objections to these declarations, primarily on the grounds that
   the declarants lack personal knowledge or that certain statements
27  contain hearsay or are irrelevant. Although some of these
   objections may have merit, the court believes that the admissible
28  evidence in these declarations is sufficient to survive summary
   judgment.

was not terminated until she repeated her offense.  (Id.)

In his Supplemental Declaration, Bianis also states
that he would periodically take a mentee of his, Ashkay Nair, off
center to take him to lunch, drive him to college or the Lemon
Hills Skills Center, and spend "substantial time" with him.
(Bianis Supp. Decl. ¶ 4.)  Bianis also helped Nair move.  (Id.)
Bianis asserts that his "supervisor and the administration knew
what [he] was doing with Mr. Nair" but he was never reprimanded.
(Id.)  Bianis is a Hispanic man who was under the age of forty at
the time of these incidents.  (Id. ¶¶ 1,5.)

In Titherington's declaration, she states that she had
witnessed "a number of staff interactions with trainees which
might be termed 'fraternization,'" which included "sexual
relationships, money-lending[,] and consuming drugs or alcohol."
(Titherington Decl. ¶ 3.)  Although some staff members were
terminated for this behavior, Titherington proceeds to describe
what she terms "second tier" fraternization, "which was deemed
appropriate and not grounds for discipline, such as weddings,
funerals[,] and graduations from partner programs."  (Id. ¶ 4.)

Titherington states that she, along with other Center
employees, attended the wedding of a trainee named Tiana
Morrisson as well as funerals for two Center trainees with the
last names of Martinez and Pranjit.  (Id. ¶ 4(c)-(e).)  After
notifying her supervisor, she also attended the wedding of
trainees by the last names of Martinez and Frisbee, where the
Center's math instructor, Robert Lassaco, presided over the
ceremony.  (Id. ¶ 4(b).)  In her Supplemental Declaration
Tiherington also states that she "regularly took students off

21

Center" and "customarily provided notice to [her] supervisor that [she[ would be taking the student/trainee off Center but . . . never asked permission." (Titherington Supp. Decl. ¶ 3.) Titherington was never disciplined for this conduct. (*Id.* ¶ 4.) Titherington asserts that, "for the most part, supervisory staff was aware of our attendance at these events" and that she "was never told that these activities constituted fraternization and could be grounds for termination." (Titherington Decl. ¶ 5.)

In Goss's declaration, she states she "would regularly take [her] 'mentees' off-Center grounds to go to lunch, get coffee or ice cream, or just socialize with them." (Goss Decl. ¶ 4.) Goss also states that her supervisor, Leslie Gillroy, was aware that she took one particular mentee, Isaac Johnson, off-Center because they "discussed [her] mentoring relationship" and she was never disciplined or instructed that her conduct was improper. (*Id.* ¶¶ 4-5.) Goss also observed that "[o]ther employees did the same thing" and recalled that a fellow employee, Halima Bishop, mentored Ashkar Singh and "did the same kind of things" that she did with her mentees. (*Id.* ¶ 5.) Goss states that brother, DeAndre Stone, attended the Center and that she regularly drove him to and from the Center without permission. (*Id.* ¶ 6.) Goss says that she attended gathering with her brother where other trainees were in attendance, and advised her supervisor of these gatherings, but was never told not to go or was disciplined as a result. (*Id.*) Goss was also never questioned by security guards at the Center about taking students off site. (*Id.* at ¶ 6.)

Goss proceeds to describe her attendance at the Frisbee

baby shower, and says she did not ask permission to go to the
gathering.  (<u>Id.</u> ¶ 7.)  Goss also notes that she talked to a
"young female employee" when she worked at CSDC that told her she
was in a romantic relationship with employee Brian Archie.  (<u>Id.</u>
¶ 8.)  Goss states that Archie was demoted at "about the time"
she became aware of "unconfirmed reports" of the relationship.
(<u>Id.</u>)  Goss is neither Filipino, nor over the age of forty.  (<u>Id.</u>
¶ 1.)

Finally, in Johnson's declaration, he provides that
Ernest Wiles, a Social Development Supervisor, "admitted in front
of [him] and Alan Roberts that he was taking [a] trainee home
with him; yet he was not disciplined and continued working at the
Center."  (Johnson Decl. ¶ 16.)  Johnson opines that "this was
highly inappropriate for an employee having young clients with
him at his home."  (<u>Id.</u>)

While far from conclusive, this evidence is sufficient
to satisfy the fourth and final prong of plaintiff's prima facie
case.  The Goss declaration establishes that a non-Filipino
person under the age of forty was allowed to socialize with
students and trainees off-Center without facing any
repercussions.  Goss specifically spoke with her supervisor about
these actions and was never rebuked.  (Goss Decl. ¶¶ 4, 7.)  Goss
is similarly-situated to plaintiff as a Center staff member who
comparably violated the fraternization policy, and was treated
differently in the way the policy was applied.[10]  Combined with

_____

[10]    Defendant claims that Goss cannot be similarly situated
to plaintiff because they did not have the same supervisor.
However, the cases defendant cites only caution that when the
same supervisor is not involved it is possible that two

23

Titherington's declaration indicating that she informed her supervisors that she took students off-Center without permission and Biantis's claims that he was never rebuked for his violations of the fraternization policy, plaintiff has established the fourth prong of the prima facie case.  Indeed, as the Ninth Circuit has advised, the "requisite degree of proof necessary to establish a prima facie case . . . is minimal and does not even need to rise to the level of a preponderance of the evidence." Lyons, 307 F.3d at 1112 (9th Cir. 2002) (quoting Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994)); see Aragon, 292 F.3d at 659 ("[T]he amount [of evidence] that must be produced in order to create a prima facie case is very little." (quoting Sischo-Nownejad v. Merced Cmty. Coll. Dist., 934 F.2d 1104, 1110-11 (9th Cir. 1991)) (alterations in original)).

           2.   Nondiscriminatory Reason and Pretext

       Because plaintiff has established a prima facie case of age, race, and national-origin discrimination, defendant must produce a legitimate, nondiscriminatory reason for terminating plaintiff's employment.  E.g., Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008).  To do so, defendant provides that

---

employment decisions will not be similarly situated.  See Radue v. Kimberely-Clark Corp., 219 F.3d 612, 618 (7th Cir. 2000) ("[D]ifferent employment decisions . . . made by different supervisors are seldom sufficiently comparable.").  The court agrees with other district courts within this circuit that an employee does not have to show they have the same supervisor as another to prove they are similarly situated because, they "must be similarly situated in all material respects- not in all respects," which is a case specific inquiry.  Bowden v. Potter, 308 F.Supp.2d 1008, 1116 (N.D. Cal 2004) (citing McGuinness v. Lincoln Hall, 253 F.3d 49, 53 (2d Cir. 2001); see Campbell v. National Passenger R.R. Corp., No. C 05-5434 CW, 2009 WL 2591611, at *7 (N.D. Cal. Aug. 21, 2009).

1  plaintiff's termination was due to his "violation of CSDC's

2  policy against fraternization with students/trainees." (Def.'s

3  Mem. Supp. Mot. Summ. J. 10:6-7.)  Defendant specifically

4  asserts:

> CSDC has a strict policy against fraternization that
> precludes staff from socializing with students off
> Center, which [p]laintiff acknowledged several times.
> Plaintiff also understood that a violation of the
> fraternization policy would result in immediate
> termination.  Plaintiff reported to his supervisor that
> he had attended the wedding of a trainee[] and provided
> the trainee a gift . . . .  Plaintiff's supervisor, along
> with the Center Director, Human Resources Manager[,] and
> the Vice President of Human Resources determin[ed] that
> . . . they had no choice but to terminate [p]laintiff['s]
> employment.

12  (Id. at 10:7-16.)  In light of this legitimate, nondiscriminatory

13  reason proffered by defendant, plaintiff must now adduce evidence

14  "show[ing] that the reason is pretextual." Davis, 520 F.3d at

15  1089.

16         In Reeves v. Sanderson Plumbing Products, Inc., 530

17  U.S. 133 (2000), the Supreme Court held that "the factfinder may

18  infer 'the ultimate fact of intentional discrimination' without

19  additional proof once the plaintiff has made out her prima facie

20  case if the factfinder believes that the employer's proffered

21  nondiscriminatory reasons lack credibility." Lyons, 307 F.3d at

22  1112-13 (9th Cir. 2002) (quoting Reeves, 530 U.S. at 147).  After

23  Reeves, the Ninth Circuit has "reiterate[d] that at the summary

24  judgment stage, a plaintiff may raise a genuine issue of material

25  fact as to pretext via (1) direct evidence of the employer's

26  discriminatory motive or (2) indirect evidence that undermines

27

28

the credibility of the employer's articulated reasons."[11]  Noyes
v. Kelly Servs., 488 F.3d 1163, 1170-71 (9th Cir. 2007) (citing
Raad v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1194
(9th Cir. 2003)). Given these "two options for proving pretext,"
the Ninth Circuit has advised that showing "the ultimate fact of
intentional discrimination" is "obviously . . . more difficult
than the burden imposed on a plaintiff to raise a triable issue
of fact as to pretext sufficient to defeat summary judgment."
Id.

        As previously addressed, plaintiff provides the
declarations of Bianis, Titherington, and Goss to undermine the
basis of defendant's articulated reasons for firing plaintiff.
Bianis, Titherington, and Goss's declarations establish that
employees regularly attended social functions off site with
students and trainees without repercussions.  The declarations
demonstrate that it was felt amongst the staff that there were
two "tiers" of fraterinzation, and that benign acts like
attending weddings, funerals, and casual social gatherings
without permission would not be punished severely, if at all.  As
noted above, these events all undermine the credibility of
defendant's reasons for firing plaintiff and lend credence to
plaintiff's argument that the fraternization policy was used as a

---

[11]    Earlier case law suggests that a plaintiff who relies
on circumstantial evidence to show pretext must produce
"specific" and "substantial" evidence.  See e.g., Godwin v. Hunt
Wesson, Inc., 150 F.3d 1217, 1222 (9th Cir. 1998).  Those cases
have been questioned in light of the Supreme Court's decision in
Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), in which the
Court affirmed the sufficiency of circumstantial evidence.  See
Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1030-31
(9th Cir. 2006) (questioning the continued viability of Godwin).

1   pretext to fire him.

2          Additionally, while the existence of some policy

3   against fraternization is evident, the notion that defendant "had

4   no choice but to terminate [p]laintiff['s] employment" may

5   reasonably appear to be an overstatement sounding in pretext.

6   (Id. at 10:15-16.)  Indeed, the Center's official "Sexual

7   Harassment [and] Staff/Student Fraternization" form indicates

8   some flexibility as to potential sanctions for fraternization.

9   (See Policy at 1 (stating that by not adhering to the policy,

10  employees will be subject to immediate discipline up to and

11  including dismissal" (emphasis added)); see also CSDC Handbook 28

12  ("The use of progressive discipline will be decided in its

13  discretion by [CSDC] in each individual case taking into

14  consideration the seriousness of the infraction, facts and

15  circumstances surrounding the case[,] and the employee's past

16  work record.").

17         Furthermore, while fraternization is listed as a

18  "dischargeable offense" in CSDC's Employee Handbook (see CSDC

19  Handbook 30), the term is placed alongside other offenses

20  sounding far more egregious than attending a trainee's wedding

21  for thirty minutes and providing a small wedding gift.  These

22  offenses include "[t]hreatening others with physical injury,"

23  "[s]tealing private Company or Government property,"

24  "[d]eliberate falsification of records," "[c]onviction of a crime

25  that has a moral impact on students," and "[c]riminal offense[s]

26  committed on the facility."  (Id. at 29-30.)  The placement of

27  "fraternization" among these offenses lends support to

28  Titherington's contention that the attendance by staff of

27

trainees' weddings, funerals, and graduations constituted "second tier" fraternization, which was "not grounds for discipline." (Titherington Decl. ¶ 4.)  See generally, e.g., James v. United States, 550 U.S. 192, 222 (2007) ("[T]he meaning of an unclear word or phrase should be determined by the words immediately surrounding it.").  This inference is further supported by the "Rules and Regulations" section of the CSDC Employee Handbook, which sternly defines "fraternization" as "non-professional, immoral[,] or unethical situations including other than 'Arm[']s Length' relationships, allowing any student/client in a staff member's place of residence without appropriate prior approval, exploiting students/clients for personal profit or gain."  (CSDC Handbook 27.)

Ultimately, although defendant contends that plaintiff's termination stemmed from the neutral enforcement of a workplace policy, the aforementioned evidence suggests that the strict application of the fraternization policy against plaintiff may have been an aberration.[12]  The Ninth Circuit, moreover, has held that the inconsistent application of a workplace policy may permit a factfinder to conclude that an employer's stated reasons for terminating an employee are pretextual.  See, e.g., Coszalter

---

[12]    In response to plaintiff's evidence, defendant presents the declaration of Jeff Stinson, Senior Vice President of Human Resources and Administration for CSDC.  Stinson provides that between 2002 and 2006, defendant terminated four non-Filipino employees for violating the fraternization policy, all of whom were under the age of forty. (Stinson Decl. ¶ 10.)  It is unclear, however, whether these employees were discharged for fraternization involving "unethical situations" or "exploiting students . . . for personal profit" or the type of "second tier" fraternization for which plaintiff was terminated.  (Titherington Decl. ¶ 4; CSDC Handbook 27.)

1  v. City of Salem, 320 F.3d 968, 977-78 (9th Cir. 2003) (denying

2  summary judgment for defendant who allegedly terminated plaintiff

3  for violating defendant's cell phone use policy where evidence

4  showed that the policy was inconsistently enforced); E.E.O.C. v.

5  Cal. Psychiatric Transitions, Inc., --- F. Supp. 2d ----, No. 06-

6  1251, 2009 WL 2399975, at *30 (E.D. Cal. Aug. 4, 2009) (Wanger,

7  J.) (holding that plaintiff had "pointed to enough evidence of

8  pretext" to survive summary judgment, including the "inconsistent

9  application of internal policies"); Baker v. Aramark Uniform &

10 Career Apparel, Inc., No. 04-549, 2005 WL 2122050, at *9 (E.D.

11 Cal. Aug. 31, 2005) (Burrell, J.) ("[A]n inconsistent application

12 of a policy can be evidence of pretext." (citing Coszalter, 320

13 F.3d at 978)).  Accordingly, plaintiff has carried his burden of

14 establishing a genuine issue of material fact as to whether

15 defendant's stated reason for his termination is pretextual.

16              3.   Same-Actor Inference

17         The Ninth Circuit has long held that "where the same

18 actor is responsible for both the hiring and the firing of a

19 discrimination plaintiff, and both actions occur within a short

20 period of time, a strong inference arises that there was no

21 discriminatory action."  Coghlan v. Am. Seafoods Co. LLC, 413

22 F.3d 1090, 1096 (9th Cir. 2005) (quoting Bradley v. Harcourt,

23 Brace & Co., 104 F.3d 267, 270-71 (9th Cir. 1996)).  "[T]he point

24 of the same-actor inference is that the evidence rarely is

25 sufficient . . . to find that the employer's asserted

26 justification is false when the actor who allegedly discriminated

27 against the plaintiff had previously shown a willingness to treat

28 the plaintiff favorably."  Id. at 1097 (internal quotation marks

29

omitted).   Here, defendant contends that the "same-actor inference" precludes plaintiff's claim of employment discrimination because "Roberts interviewed Plaintiff for the position of Career Counselor[] and made the decision to hire Plaintiff" and subsequently "approved his termination for violating the fraternization policy." (Def.'s Mem. Supp. Mot. Summ. J. 13:4-5.)

        As an initial matter, the court notes that the four-year span between plaintiff's hiring and termination--while not necessarily negating application of the same-actor inference--may at least weaken its potency.  Cf. Coleman v. Quaker Oats Co., 232 F.3d 1271, 1286 (9th Cir. 2000) (applying the same-actor inference where the time span between favorable and alleged discriminatory actions was one year); Bradley, 104 F.3d at 270-71 (same); Coghlan, 413 F.3d at 1097 (applying the same-actor inference where the time span between favorable and alleged discriminatory actions was three years, although noting that "Bradley did limit its holding to cases where the alleged discrimination took place 'within a short period of time'").

        It is unclear, moreover, whether Roberts was the relevant decision maker for both the hiring and termination of plaintiff; although Roberts provides that he was "involved" in hiring plaintiff, Bianis asserts that, "[i]n [his own] capacity [as] Counseling Supervisor, [he] interviewed and hired Melvyn Rosales as a counselor in [his] department." (Bianis Decl. ¶ 3.) For these reasons, the same-actor inference may find stronger application with respect to Roberts' involvement in plaintiff's promotion to ACT/OCT Coordinator between in the fall of 2005.

1  (Rosales Decl. ¶¶ 18-19; Roberts Decl. ¶ 4); see Hartsel v. Keys,

2  87 F.3d 795, 804 n.9 (6th Cir. 1996), cited with approval in

3  Coghlan, 413 F.3d at 1096.

4       Nonetheless, while the same-actor inference may sway a

5  fact finder in deciding whether plaintiff ultimately prevails on

6  his claims, there is little support in the Ninth Circuit for the

7  proposition that the same-actor inference warrants summary

8  judgment for defendant where, as here, plaintiff has established

9  a prima facie cased and adduced evidence of pretext.  Cf.

10 Bradley, 104 F.3d at 271 (relying in part on the same-actor

11 inference in granting summary judgment against plaintiff where

12 she "did not produce any evidence showing [her employer's]

13 proffered reasons were pretexts for an improper discriminatory

14 motive"); Coleman, 232 F.3d at 1287 (relying in part on the same-

15 actor inference in granting summary judgment against plaintiff

16 where she "ha[d] not cast doubt on the sincerity of [defendant's]

17 explanation").  Accordingly, in light of the evidence presented

18 by plaintiff, the court cannot grant summary judgment in

19 defendant's favor based on the same-actor inference.

20      D.   Retaliation

21      Retaliation claims made pursuant to Title VII, the

22 ADEA, and FEHA are also analyzed pursuant to the burden-shifting

23 framework prescribed by the Supreme Court in McDonnell Douglas.

24 See Whitman v. Mineta, 541 F.3d 929, 932 (9th Cir. 2008); Xin Liu

25 v. Amway Corp., 347 F.3d 1125, 1143 (9th Cir. 2003).  Under

26 McDonnell Douglas, the burden of production first falls upon

27 plaintiff to present a prima facie case of retaliation.  Xin Liu,

28 347 F.3d at 1143.  To do so, plaintiff must show that (1) he was

engaging in a protected activity, (2) his employer subjected him to an adverse employment action, and (3) there was a causal link between the protected activity and the employer's action.  <u>Id.</u> at 1143-44 (citing <u>Bergene v. Salt River Project Agric. Improvement & Power Dist.</u>, 272 F.3d 1136, 1140 (9th Cir. 2001)).

To satisfy the first element of his prima facie case for retaliation, plaintiff proffers two instances in which he complained to Eugene Harris and Peter Gregerson that he had been passed over for promotions due to his age and race.[13]  (<u>See</u> Pl.'s Mem. Opp'n Summ. J. 20:10-15; Rosales Decl. ¶¶ 10-11, 16.)  It is well-established that making complaints of unlawful discrimination constitutes protected activity for purposes of retaliation claims.  <u>See, e.g.</u>, 42 U.S.C. § 2000e-3(a); <u>Manatt v. Bank of Am., NA</u>, 339 F.3d 792, 800 (9th Cir. 2003).  As to the second element of plaintiff's prima facie case, it is undisputed that defendant terminated plaintiff's employment, which qualifies as an adverse employment action.  <u>See generally</u> <u>Fonseca v. Sysco Food Servs. of Ariz., Inc.</u>, 374 F.3d 840, 847 (9th Cir. 2004); <u>Aragon v. Republic Silver State Disposal Inc.</u>, 292 F.3d 654, 660 (9th Cir. 2002).

With respect to the third element of plaintiff's prima facie case, however, plaintiff concedes that "the causal link [between his complaints and his termination] is admittedly more

---

[13]     Plaintiff does not contest defendant's assertion that his complaint regarding Bianis's demotion was not a protected activity.  (<u>See</u> Def.'s Mem. Supp. Mot. Summ. J. 18:12-19:9; Pl.'s Opp'n Summ. J. 20:8-15; Rosales Decl. ¶¶ 5-7.)  Absent any evidence indicating that this complaint involved "oppos[ing] any . . . unlawful employment practice," 42 U.S.C. § 2000e-3(a), the court will adopt defendant's position.

precarious." (Pl.'s Mem. Opp'n Summ. J. 20:15-16.)  Indeed,
although plaintiff "may use circumstantial evidence" to establish
a "causal link," he must ultimately "demonstrate the employer's
knowledge of the protected activity and proximity in time between
the protected activity and the adverse action." O'Neil v. Henkel
Adhesive, No. 06-3614, 2007 WL 2261560, at *6 (N.D. Cal. Aug. 6,
2007) (citing Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir.
1987); Morgan v. Regents of the Univ. of Cal., 88 Cal. App. 4th
52 (2000); see Manatt, 339 F.3d at 802.

     Here, not only does plaintiff lack any evidence that
the relevant decisionmakers were aware of his complaints, but
defendants also have presented uncontroverted evidence that all
of the decisionmakers attest that they had no knowledge of
plaintiff's complaints regarding age and race discrimination.
(See Roberts Decl. ¶ 7; Allen Decl. ¶ 9; Stinson Decl. ¶ 5.)[14]
While plaintiff contended at the hearing on this motion that
knowledge of the complaints by one member of the administration
of the Center should be imputed to other decisionmakers within
the Center, plaintiff admitted that there is no authority to
support this proposition.  Furthermore, the time span between
plaintiff's most recent complaint and his termination was
approximately twenty months, thus negating any inference of
causation.  See, e.g., Manatt, 339 F.3d at 802 ("While courts may
infer causation based on the proximity in time between the

---

     [14]  Although McClure also participated in the decision to
terminate plaintiff's employment, plaintiff has stipulated that
"the only person he believes discriminated against him or treated
him poorly [was] Alan Roberts." (Pl.'s Opp'n Stmt. Undisputed
Facts No. 21.)

33

protected action and the allegedly retaliatory employment
decision, such an inference is not possible in this case because
approximately nine months lapsed between the date of Manatt's
complaint and the Bank's alleged adverse decisions." (citations
and internal quotation marks omitted)).

Contrary to plaintiff's protestations, he cannot
withstand summary judgment based on the mere "possibility that
[his termination] could be causally related to [his] earlier
complaints about discrimination." (Pl.'s Mem. Opp'n Summ. J.
20:21-23.) See generally Nissan Fire & Marine Ins. Co., Ltd. v.
Fritz Cos., Inc., 210 F.3d 1099, 1103 (9th Cir. 2000) ("If . . .
a moving party carries its burden of production, the nonmoving
party must produce evidence to support its claim or defense."
(citing Cline v. Indus. Maint. Eng'g & Contracting Co., 200 F.3d
1223, 1229 (9th Cir. 2000); High Tech Gays v. Def. Indus. Sec.
Clearance Office, 895 F.2d 563, 574 (9th Cir. 1990))).
Accordingly, because plaintiff cannot carry his burden of
establishing a prima facie case of retaliation, the court will
grant defendant's motion for summary judgment with respect to
plaintiff's retaliation claims.

E.   Wrongful Discharge in Violation of Public Policy

The tort of wrongful termination in violation of public
policy "is based on the principle that, although an employer may
terminate an at-will employee for no reason, or any arbitrary or
irrational reason, the employer has no power to terminate the
employee for a reason contrary to the law or fundamental public
policy." Phillips v. St. Mary Reg'l Med. Ctr., 96 Cal. App. 4th
218, 226 (2002).  Here, the parties agree, and relevant caselaw

34

supports, that this claim is derivative of plaintiff's Title VII, ADEA, and FEHA claims.  (<u>See</u> Def.'s Mem. Supp. Summ. J. 21:25-22:5; Pl.'s Mem. Opp'n Summ. J. 21:2-6); <u>see also, e.g.</u>, <u>Winarto v. Toshiba Am. Elecs. Components, Inc.</u>, 274 F.3d 1276, 1287 n.11 (9th Cir. 2001).  Accordingly, the court will deny defendant's motion for summary judgment on this claim insofar as it is based on plaintiff's claims of race, national-origin, and age discrimination; the court will grant the motion, however, insofar as this claim is based on plaintiff's retaliation claims.

        IT IS THEREFORE ORDERED that defendant's motion for summary judgment be, and the same hereby is,

        (1) GRANTED as to plaintiff's retaliation claims;

        (2) GRANTED as to plaintiff's claim for wrongful termination in violation of public policy insofar as it is based on his retaliation claims; and

        (3) DENIED in all other respects.

DATED:  November 1, 2009

_____
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE